NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Hon. Harold A. Ackerman |
| v. | ) | |
| | ) | Criminal No. 07-706 (HAA) |
| SHAKA KARRIEM, | ) | |
|     a.k.a. "Derrick Davis," | ) | **OPINION AND ORDER** |
|     a.k.a. "Eric Gibbons," | ) | **ON PRETRIAL MOTIONS** |
|     a.k.a. "Eric Green," | ) | |
| | ) | |
|           Defendant. | ) | |

_____)

Douglas Herring, Esq.
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
970 Broad Street, Suite 700
Newark, New Jersey 07102
*Attorneys for United States of America*

John H. Yauch, Esq.
Assistant Federal Public Defender
OFFICE OF THE FEDERAL PUBLIC DEFENDER
972 Broad Street, Fourth Floor
Newark, New Jersey 07102
*Attorneys for Defendant*

**ACKERMAN**, **Senior District Judge:**

     This matter comes before the Court on the pretrial motions (Doc. No. 27) filed by

Defendant Shaka Karriem.  For the following reasons, Defendant's motions will be denied.  The

Government's cross-motion (Doc. No. 29) for reciprocal discovery will be granted.

     The one-count Indictment in this matter charges Defendant Shaka Karriem (a.k.a.

"Derrick Davis," "Eric Gibbons," and "Eric Green") with being a felon in possession of a

firearm, in violation of 18 U.S.C. § 922(g)(1).  The Indictment also contains a notice of forfeiture with regard to the gun.  Defendant has filed several pretrial motions, including, most notably, a motion to suppress the gun seized from his car without a warrant by Newark police officers. Defendant has also moved to strike his purported aliases from the Indictment, and to dismiss the forfeiture allegation from the Indictment.  Finally, Defendant makes various pretrial discovery and hearing requests.  In opposing Defendant's motions, the Government cross-moved for reciprocal discovery.

In a Letter Order dated July 16, 2008, this Court granted Defendant's request for an evidentiary hearing on his suppression motion, and the Court held the hearing on September 18, 2008.  At the hearing, the Court heard testimony from several witnesses, including the officers who arrested Defendant, and also heard brief oral argument on Defendant's other pretrial motions.  Additionally, Defendant also requested at the hearing that the Government produce the entire Newark Police Department personnel and internal affairs files for testifying Officers Grainger and Washington for *in camera* review.

## Background

### I.     Factual Background[1]

In the late afternoon on February 26, 2007, officers of the Newark Police Department were conducting narcotics surveillance in the vicinity of 515 Elizabeth Avenue in Newark, New

---

[1]The Court bases the background factual discussion in this section on the record established at the suppression hearing.  The Court provides this information solely for the purpose of these pretrial motions, ever mindful that Defendant is presumed innocent until proven guilty.  Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Jersey.  According to the Incident Report, this area "is well known to all officers where numerous complaints have been received regarding [ ] narcotics being sold day and night."  (Incident Rep. at 1.)  Officers Michael Grainger, Samad Washington and Kevin Matthews, and Lieutenant Neil Minovich were working in plain clothes and using "non-conventional vehicles" (i.e. unmarked police cars).  At approximately 4:50 P.M., Officer Grainger saw a male flag down a motorist in a Lexus that was slowly driving by the location.  According to Officer Grainger's testimony at the suppression hearing, Defendant was the driver of the Lexus.  Defendant parked his car in front of 525 Elizabeth Avenue, exited the vehicle, and walked over to the male who flagged him down. Officer Grainger testified that the two men spoke in front of the apartment buildings on Elizabeth Avenue for a few minutes.  Defendant and the other male exhibited no furtive or evasive conduct and did not exchange any money or objects during their conversation.  Officer Washington's and Lieutenant Minovich's testimony at the hearing substantially corroborated Officer Grainger's description of these events

After Defendant and the other male talked for a few minutes, a marked police car passed by the location.  Defendant and the other male looked back and watched the marked car pass, and then walked towards the building at 515 Elizabeth Avenue.  Officer Grainger, a 16-year veteran of the Newark Police Department who had been working in narcotics detail for approximately three and a half years at the time, stated at the hearing that "[t]wo civilians being concerned which way the police were going at that point drew my attention to both of them."  (Tr. 9:16-17.) Indeed, Officer Grainger testified on cross-examination that the two men "made it their business to see if the patrol car was in fact going to stop."  (Tr. 24:8-9.)  Officer Grainger than observed Defendant walk back towards his parked car and entered the vehicle on the driver's side.  Officer

Grainger exited his own unmarked car to "further investigate his actions." (Tr. 9:24-25.) The

other, unidentified male remained standing in the driveway of 515 Elizabeth Avenue as Officer

Grainger began his investigation. On cross-examination, Officer Grainger explained the reason

for his investigation of Defendant:

> From my experience in narcotics, it's common practice where
> conversations take place and individuals walk back to a vehicle and
> take actions inside the vehicle and step back out of the vehicle to
> reapproach the individual that was standing there. The conversation
> didn't just take place where the other individual walked into 515
> Elizabeth Avenue or walked away. He stood there. So it lead me to
> believe that he was getting something out of his car. They were
> taking care of some type of business in his car, to reapproach this
> individual who was still waiting for him.

(Tr. 25:4-13.)

Officer Grainger approached the passenger's side of Defendant's car, from the sidewalk.

As he approached, he signaled for Agent Washington, still in an unmarked car, to come a little

closer to Defendant's vehicle. Upon reaching Defendant's car, Officer Grainger looked through

the passenger's side window and observed Defendant "still sitting in the driver's seat. He had a

weapon in his hand, at which time he bent down to the floor area where it was found to be put,

the weapon, that same weapon underneath the mat of the car." (Tr. 10:24-11:2.) Defendant held

the gun "in his right hand close to his body, and he was moving down toward the floor area."

(Tr. 11:17-18.) This testimony substantially tracks the narrative of the Incident Report prepared

by Officer Grainger. According to the Incident Report, the officer saw through the window that

Defendant was "leaning down towards the [] area of the drivers' side of the vehicle with his keys

lying on the passengers side seat area." (Incident Rep. at 2.) The officer "noticed the suspect

holding a chrome handgun he was attempting to place under the mat lifting his foot." (*Id.*)

4

At the time that Officer Grainger witnessed the gun in Defendant's hand, Officer Washington drove his unmarked car nearer to the bumper of Defendant's car and exited his vehicle. Officer Grainger proceeded to walk around to the back of Defendant's car and made a hand signal to Officer Washington signifying that a gun was present. Officer Grainger approached the driver's side, identified himself to Defendant as a police officer, and asked him to step out of the vehicle. Defendant did so, and Officer Washington – who also testified at the suppression hearing after being called by the defense – detained Defendant while Officer Grainger leaned into Defendant's vehicle. According to Officer Grainger, "I could see the handle of the gun protruding from the mat of the front seat drivers' side, and I pulled the weapon out, advised [Defendant] he was under [ar]rest, and cuffed him." (Tr. 12:18-21.) This testimony also tracks the description in the Incident Report. Later analysis revealed that the weapon was a Pietro Beretta .380 caliber pistol with six round-nose bullets, one in the chamber and five more in a magazine inserted in the gun. The serial number on the handgun was defaced. Officer Grainger testified that Defendant was also found in possession of a "large sum of currency." (Tr. 13:2-3.) Upon his arrest, Defendant was quickly placed into the back of a police unit and transported to the South District police station.

Defendant presented his version of the events through the testimony of Wallace Phillips, a resident of Elizabeth Avenue who knew Defendant and testified that he was shopping at a grocery store on Elizabeth Avenue in the late afternoon on February 6, 2007. Phillips stated that when he arrived at the store, around 4:30 P.M. according to his testimony, Phillips saw two police officers talking to Defendant in the walkway of the store. He testified that he knew that the men to whom Defendant was talking were police officers because he "knows cops when [he]

5

see[s] them," even though he could not remember if either man was in uniform.  (Tr. 72:11, 13.)
Phillips also could not remember the ethnicity of the individuals he felt by "instinct[]" were
police officers (Tr. 72:19), and he admitted that he was not paying much attention (Tr. 75:14-15,
75:24-76:1).  When asked whether the conversation between Defendant and the two officers was
confrontational, Phillips stated that "I didn't pay that any mind.  I didn't pay that no attention."
(Tr. 73:8.)  After shopping in the store for five or six minutes, Phillips exited the store and stated
that he again saw Defendant and the two others in the same place, still talking.[2]  In contrast,
Officer Washington testified that none of the officers spoke to Defendant in front of the store at
525 Elizabeth Avenue or anywhere else prior to Officer Grainger's viewing of the gun and
Defendant's arrest.

　　　As discussed, Defendant was arrested by the Newark Police on February 26, 2007.  The
federal Indictment against him for felon-in-possession was issued on August 24, 2007.  The
Indictment charges Defendant as "Shaka Karriem" and also lists his three known aliases,
"Derrick Davis," "Eric Gibbons," and "Eric Green."

---

　　　[2]In an Affidavit submitted for purposes of requesting an evidentiary hearing, Defendant
himself claims that around 3:00 P.M. on the day in question, he exited the building located at 515
Elizabeth Avenue, whereupon he was "approached by Newark Police Officers who questioned
and detained [him]."  (Karriem Aff. ¶ 4.)  Defendant states that he "was not told by the police
why they were taking these actions."  (*Id.*)  Defendant asserts that after he was detained, "one
police officer claimed he found a gun in my car and I was brought to the police station and
charged.  The police had no reason to detain me or search my car."  (*Id.* at ¶ 5.)  This version of
events roughly matches Phillips's testimony, with one important caveat: Defendant states that he
was approached by the officers around 3:00 P.M., while Phillips observed Defendant conversing
with individuals assumed to be officers around 4:30 P.M.

## II.    Credibility Determinations

Solely for the purposes of the instant motion to suppress, this Court finds the testimony of the officers to be credible and compelling.  This Court therefore accepts the version of events offered by Officer Grainger and corroborated by Officer Washington and Lieutenant Minovich. Any inconsistencies between their testimony and the Incident Report were minor and do not discredit the officers' depiction of the relevant events of February 26, 2007.  For example, Officer Grainger testified at the hearing that he first witnessed the gun in Defendant's hand, but the Incident Report does not state expressly that the officer first observed the gun in Defendant's hand before Defendant attempted to place the gun under the front mat.  Officer Grainger's testimony necessarily provided a fuller depiction of the events than the summary provided in the Incident Report, and he testified that his recollection of the relevant events was just as good at the hearing as at the time of those events because "[i]nvolving a gun,  . . . I don't forget."  (Tr. 39:2-3.)  In any event, this Court does not find the minor discrepancy between the Incident Report and Officer Grainger's testimony material with regard to Officer Grainger's credibility or the legality of the search here.

During cross-examination, defense counsel stressed the existence of a center console in Defendant's vehicle that might have obscured Officer Grainger's initial view of Defendant's placement of the gun under the floor mat, and almost certainly concealed the floor mat itself from Officer Grainger's initial view while looking through the passenger's side window.  However, this Court finds Officer Grainger's explanation of what he saw through that window to be believable and rational.  His testimony illustrates that he saw the gun in Defendant's right hand, and then the Defendant moved the gun "along side his right leg, and I have it in my report,

7

underneath the floor mat because that's where the weapon was in fact found."  (Tr. 34:25-35:2.)
Officer Grainger further stated that "[i]t's obvious that his hand went down to the right side of
his body, and he placed it underneath that particular floor mat that was on the floor of that side of
that vehicle."  (Tr. 35:2-5.)

Furthermore, the testimony of Wallace Phillips, upon which Defendant relied, strained
this Court's credulity.  Phillips's memory of the day in question was questionable at best, as he
admitted that he was not paying close attention and could remember little about the individuals
he presumed to be police officers.  While he was certain that he saw Defendant in the walkway of
the grocery store, I find Phillips's testimony to lack credibility, especially in light of the
testimony of the officers.  I therefore reject Phillips's version of events for the purpose of
resolving Defendant's motion to suppress.


*Analysis*

I.      **Defendant's Motion to Suppress**

Defendant has moved to suppress the weapon seized without a warrant by the Newark
Police from his car.  The Fourth Amendment provides that the "right of the people to be secure in
their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not
be violated."  U.S. Const. amend. IV.  Where a search is conducted without a warrant, as here,
the Government bears the burden to show by a preponderance of the evidence that the
warrantless search was conducted pursuant to an "exception" to the warrant requirement.  *See,
e.g.*, *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992); *United States v. Santos*, 340
F. Supp. 2d 527, 533 (D.N.J. 2004).  This case implicates the plain-view exception.  As the

8

Government states in its brief, "[t]he crux of the suppression issue is whether or not the Officers

saw the Defendant with the weapon, as detailed in the Incident Report."  (Gov't Br. at 15.)

Our Court of Appeals recently reiterated the well-established contours of the plain-view

doctrine:

> If police are lawfully in a position from which they view an object, if
> its incriminating character is immediately apparent, and if the officers
> have a lawful right of access to the object, they may seize it without
> a warrant.  If, however, the police lack probable cause to believe that
> an object in plain view is contraband without conducting some further
> search of the object – i.e., if its incriminating character [is not]
> immediately apparent – the plain-view doctrine cannot justify its
> seizure.

*United States v. Yamba*, 506 F.3d 251, 257-58 (3d Cir. 2007) (quoting *Minnesota v. Dickerson*,

508 U.S. 366, 375 (1993) (citations and internal quotation marks omitted)).  Thus, three elements

must be met to establish the validity of a warrantless search and seizure under the plain-view

doctrine: 1) the officer was legally in a position from which he or she can see the object; 2) the

incriminating character of the object was immediately apparent; and 3) the officer had a lawful

right of access to the item.  *See Horton v. California*, 496 U.S. 128, 136 (1990); *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 464-73 (1971); *United States v. Menon*, 24 F.3d 550, 559 (3d Cir.

1994); *United States v. Scarfo*, 685 F.2d 842, 845 (3d Cir. 1982).  The Supreme Court has stated

that "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is

observed by a police officer from a lawful vantage point, there has been no invasion of a

legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth

Amendment – or at least no search independent of the initial intrusion that gave the officers their

vantage point."  *Dickerson*, 508 U.S. at 375; *see also Illinois v. Andreas*, 463 U.S. 765, 771

(1983) ("The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item, its owner's privacy interest in that item is diminished.").

Based on the credible testimony of Officer Grainger and his fellow officers, the Court finds that the plain-view exception applies in this case, and under this doctrine, the weapon was lawfully seized.  The police observed Defendant park his car near a known drug area after being flagged down by an unknown person, and Defendant had a conversation with this person while walking towards the building at 515 Elizabeth Avenue, a location known for narcotics activity. Upon seeing a marked patrol car, Defendant returned to his car.  Officer Grainger observed the gun in plain view from his vantage point outside Defendant's passenger's side window.  He plainly observed Defendant move the gun towards the floor, and his initial view of the gun and Defendant's movement of the gun was confirmed by his subsequent search of the car and seizure of the gun after seeing it partially hidden under the floor mat.

The Government has met its burden to establish all the elements of the plain-view doctrine by a preponderance of the evidence.  First, Officer Grainger was legally in a position from which he could see the gun, because he viewed gun from the outside of Defendant's parked car, through the passenger's side window.  The Supreme Court held in *Texas v. Brown* that where "[t]he general public could peer into the interior of [the defendant's] automobile from any number of angles[,] there is no reason [the officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen."  460 U.S. 730, 740 (1983). Under *Brown*, therefore, Officer Grainger perceived the weapon in Defendant's car from a legal vantage point outside the passenger's side window, as the police had not even stopped the vehicle (it was already parked) and had not detained Defendant or even talked to him at that

10

point.[3]  Second, the incriminating character of the weapon was immediately apparent, both from

its very nature as a gun and also from Defendant's obvious attempt to hide it.  *See United States*

*v. Mosley*, No. 01-664, 2002 WL 32351168, at *3 (E.D. Pa. Sept. 18, 2002) (finding seizure of

firearm valid under plain-view doctrine, and concluding that officers "had probable cause to

believe that [defendant] possessed the gun unlawfully, in light of his attempt to hide it").  Upon

seeing the gun in plain view, Officer Grainger had probable cause to believe that it was

contraband without any further search.

Finally, Officer Grainger had a lawful right of access to the dangerous weapon seen in

plain sight.  As the Supreme Court established in *Brown*, there is no legitimate expectation of

privacy with regard to the interior of a vehicle that may be viewed from outside the vehicle.  460

U.S. at 740; *accord United States v. Holyfield*, No. 04-35, 2005 WL 2106624, at *5 (W.D. Pa.

Aug. 26, 2005) (finding "lawful right of access" prong of plain-view doctrine satisfied because "a

law enforcement officer may seize contraband from the interior of a car if it may be viewed 'from

outside the vehicle by either inquisitive passersby or diligent police officers.'" (quoting *Brown*,

460 U.S. at 740)).  The third prong serves to prevent a specific search from expanding into a

general, unlimited search absent exigent circumstances.  *See Horton*, 496 U.S. at 137 n.7.  Here,

the exigency created by the danger posed by the firearm to the officers' safety justified their right

---

[3]Furthermore, Officer Grainger provided valid reasons for his initial suspicion of
Defendant's actions, based on his experience with narcotics work.  Thus, Officer Grainger's
initial investigation of Defendant, by approaching the passenger's side window, may be seen as a
valid *Terry* stop, as the officer "observe[d] unusual conduct which [led] him reasonably to
conclude in light of his experience that criminal activity may be afoot and that the person with
whom he [dealt] with may be armed and presently dangerous."  *Terry v. Ohio*, 392 U.S. 1, 30
(1968).  Officer Grainger's permissible approach to conduct an investigatory *Terry* stop further
reinforces the legality of the officer's vantage point.

of access to that firearm.  *See Terry*, 392 U.S. at 27 (holding that for limited warrantless search and seizure pursuant to investigatory stop, test is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger").

　　　For these reasons, the plain-view doctrine, as most recently explained by the Third Circuit in *Yamba*, justifies the search of Defendant's vehicle and allowed the police, consistent with the Fourth Amendment, to seize the weapon from Defendant's car without a warrant.[4]  This Court will deny Defendant's motion to suppress the weapon.

**II.　　Defendant's Motion to Strike Aliases from the Indictment**

　　　In the caption of the Indictment, Defendant is identified as Shaka Karriem and also by three aliases: "Derrick Davis," "Eric Gibbons," and "Eric Green."  Pursuant to Federal Rule of Criminal Procedure 7(d), Defendant moves to strike these aliases as surplusage.  An alias may be stricken where the alias does not serve a relevant purpose, such as to identify the defendant or protect him from double jeopardy.  *See United States v. Beedle*, 463 F.2d 721, 725 (3d Cir. 1972) ("The practice of allowing aliases to exist has been condemned where . . . they serve no useful purpose either to identify the accused or to protect him from double jeopardy.").  However, "an

---

[4]Although this Court bases its ruling on the plain-view doctrine, other exceptions could apply here because the officers searched a vehicle.  "[S]o long as probable cause to search exists, a vehicle, because of its movable nature, may be the subject of a warrantless search."  *Mosley v. Yaletsko*, 275 F. Supp. 2d 608, 614 (E.D. Pa. 2003) (collecting cases).  For example, "the Supreme Court has . . . held that search of the passenger compartment of an automobile, limited to those places where a weapon may be placed or hidden, is permissible if the officer has a reasonable belief based on specific and articulable facts that a driver may be armed and dangerous."  *Id.* at 614-15 (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)).  Under the automobile exception, Officer Grainger had a reasonable belief based on specific and articulable facts that Defendant, the driver, was armed and dangerous.  Such reasonable belief justified the search of the passenger compartment where a weapon may be hidden or placed.

alias in an indictment, even one with strong negative connotations, is permissible if it is needed to connect the accused to the acts charged." *United States v. Vastold*, 899 F.2d 211, 232 (3d Cir. 1990), *rev'd on other grounds*, 497 U.S. 1001 (1990).  In such circumstances, "the government normally has been required to prove that the defendant was known by the alleged alias." *Id.*  As the Fourth Circuit has held:

> If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted. However, if the prosecution either fails to offer proof relating to the alias or the alias, though proven, holds no relationship to the acts charged, a motion to strike may be renewed, the alias stricken and an appropriate instruction given the jury.

*United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976) (internal citations omitted).

In this felon-in-possession case, the Government must prove beyond a reasonable doubt that Defendant has previously been convicted of a felony.  "Even if prejudicial, aliases and nicknames are proper in an indictment where they will be part of the government's proof at trial." *United States v. Persico*, 621 F. Supp. 842, 861 (S.D.N.Y. 1985).  The Government contends that "[a] review of the Defendant's numerous judgments of conviction reveals that he has used several aliases."  (Gov't Br. at 11.)  Accordingly, the Government claims that the aliases must be used to connect Defendant to his prior felony conviction.

At oral argument, Defendant's counsel stated that the parties would reach a stipulation of fact as to Defendant's prior felony conviction, and that such agreement would obviate any need for the aliases to appear in the indictment or for proof of the aliases to be introduced at trial. Thus, this Court stated that it would hold off on resolving Defendant's motion to strike the

aliases.  Nearly three months later, however, no stipulation on this issue has been filed.  Because the result based on the applicable law in this case is clear, this Court is prepared to rule on this issue so that the parties may be guided accordingly.

The Government states that Defendant's prior felony conviction bears the names "Eric Gibbons, aka Karriem Shakaj aka Derrick Davis."  (Gov't Br. at 11.)[5]  Therefore, inclusion of Defendant's several aliases in the Indictment (absent Defendant's stipulation to his prior conviction) is necessary to link Defendant to his prior felony and thereby prove an element of the charged crime.  *See United States v. Moya-Gomez*, 860 F.2d 706, 762 (7th Cir. 1988) ("When proof of an alias is relevant to identifying the defendant, or otherwise relates to the proof of the acts charged in the indictment, it is permissible for the prosecution to include it in the indictment.").  Furthermore, the aliases themselves are not so inflammatory or incriminating such that Defendant would be unduly prejudiced by their use.  *See United States v. Vasquez*, No. 07-423, 2008 WL 756071, at *1 n.1 (E.D. Pa. Mar. 20, 2008) ("[W]hen a defendant's alias does not in itself connote criminality, as do nicknames such as Frankie the Beast, The Snake, or Fast Eddie, there is no risk the alias might unfairly prejudice him.") (internal quotation omitted).

Defendant cites cases in which courts have expressed general disapproval of the use of aliases, but as Defendant concedes, these cases clearly allow for the use of aliases where proof of an alias is relevant to identifying the defendant.  *See Beedle*, 463 F.2d at 725 (finding error in not

---

[5]This Court's search of the publicly available New Jersey Offender Database finds support for the Government's representation.  A review of the New Jersey Department of Corrections Offender Search Web Page reveals that Eric Gibbons, a.k.a. "Derrick Davis," "Eric Green," and "Karriem Shakaj," was convicted of three felonies in New Jersey in 1995: aggravated assault, theft, and unlawful possession of a weapon. https://www6.state.nj.us/DOC_Inmate/details?x=1040414&n=0 (last visited Dec. 3,2008).

striking alias where alias was due to government's misspelling of defendant's name, but allowing use of aliases where they serve useful purpose to "identify the accused or to protect him from double jeopardy"); *United States v. Wilkerson*, 456 F.2d 57, 59 (6th Cir. 1972) ("Only when proof of an alias is relevant to identifying the defendant should a court allow its inclusion in the indictment and its subsequent introduction at trial.").  Defendant's motion to strike the aliases will be denied.

Defendant asks, in lieu of striking the aliases, that before the aliases are mentioned to the jury, the Government be "required to prove that any such alias is material and necessary towards identifying [Defendant] and that the prejudicial impact is outweighed by probative value." (Def.'s Br. at 15.)  The Government implicitly agrees, as it represents that "[u]nless stipulated to in advance of trial, the Government intends to introduce evidence that the Defendant was convicted of a felony, and that his judgment of conviction bears the names 'Eric Gibbons, aka Karriem Shakaj aka Derrick Davis.'"  (Gov't Br. at 11.)  Such proof would be sufficient to justify retaining the aliases in the Indictment and informing the jury of the aliases.  This Court will hold the Government to its representation.  If no stipulation is reached, and if such proof is not offered at trial, Defendant may renew his motion to strike and, if well-founded, this Court will strike the aliases and give an appropriate curative instruction to the jury.  *See Clark*, 541 F.2d at 1018.

In light of this ruling, the Court encourages the parties to stipulate to the fact of the prior felony conviction, as suggested by defense counsel at oral argument.  Such a stipulation would save the time and resources of all concerned by rendering any evidentiary presentation at trial regarding the prior conviction and the aliases unnecessary.

### III.     Defendant's Motion to Dismiss Notice of Forfeiture

In addition to the one count of being a felon in possession of a firearm, the Indictment also contains a notice of forfeiture pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c). Section 924(d)(1) of Title 18 provides that "[a]ny firearm or ammunition involved in or used in any knowing violation of" various subsections of § 922, including § 922(g)(1), the subsection charged here, "shall be subject to seizure and forfeiture."  The statute further provides that any "action or proceeding for the forfeiture of firearms or ammunition shall be commenced within one hundred and twenty days of such seizure."  18 U.S.C. § 924(d)(1).  Section 2461(c) of Title 28 allows the Government to include notice of forfeiture in the indictment of a person charged with a crime for which civil or criminal forfeiture is authorized.  "If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case."  28 U.S.C. § 2461(c).  Pursuant to these provisions, the Indictment seeks, upon Defendant's conviction, the forfeiture of the gun and ammunition seized from Defendant.

Defendant moves to dismiss this forfeiture allegation, arguing that it is untimely under § 924(d)(1)'s 120-day limitations period.  Defendant argues that because the firearm was seized by the Newark police on February 26, 2007, but the notice of forfeiture was not presented until the issuance of the Indictment on August 24, 2007, therefore the Government did not commence its forfeiture "action" within the 120-day period.  The Government responds that Defendant was arrested by *state* authorities on February 26, 2007, and that the Government did not have jurisdiction to file any notice of forfeiture until the issuance of the Indictment.  Therefore, the Government urges that the statute of limitations began to run on the date of the Indictment, and

16

that the forfeiture allegation is timely because it was presented in the Indictment itself.

Neither the Government nor Defendant offers any caselaw to support their contentions, and the precedent this Court has located addresses exclusively civil, *in rem* forfeiture actions, and not a criminal notice forfeiture presented in an indictment pursuant to 28 U.S.C. § 2461(c). *See, e.g.*, *United States v. Miscellaneous Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 713 (7th Cir. 2004) (holding, in civil forfeiture action brought by Government after gun owner was charged with felon-in-possession, that "the time limitation in § 924(d)(1) merely requires the United States to initiate either an administrative forfeiture proceeding or a judicial forfeiture action within 120 days of seizure"). Arguably, the 120-day limitations provision does not even apply to notices of forfeiture brought in an indictment. This limitations period applies to "any action or proceeding for the forfeiture of firearms or ammunition." 18 U.S.C. § 924(d)(1). Section 2461(c) of Title 28 expressly authorizes the inclusion of "notice of the forfeiture" in an indictment, and only requires that the defendant be charged with a crime for which "the civil or criminal forfeiture of property is authorized." Section 924(d)(1) authorizes such forfeiture and thus triggers the applicability of the criminal forfeiture mechanism of § 2461(c). Notably, § 2461(c) contains no limitations period. A reading of the statutes in combination could yield the conclusion that the 120-day period of 18 U.S.C. § 924(d)(1) applies to separate civil forfeiture proceedings, and not notices of forfeiture filed as addenda to criminal indictments pursuant to 28 U.S.C. § 2461(c).[6] Indeed, it could be argued that the statutory

_____

[6]The statute provides that "all provisions of the Internal Revenue Code of 1986 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter." 18 U.S.C. § 924(d). Incorporation of such civil forfeiture provisions further suggests that § 924(d) applies only to separate civil actions.

language "[a]ny action or proceeding for the forfeiture of firearms or ammunition" only applies to separate "actions or proceedings," and not to a notice of forfeiture included in an indictment, because a criminal indictment is not merely a forfeiture proceeding.

This Court is fortified in this reading by the fact that courts have routinely allowed, without comment, forfeiture allegations in criminal indictments based on "delays" far longer than that here. *See, e.g.*, *United States v. Kubowksi*, 85 F. App'x 686, 687 (10th Cir. 2003) (failing to discuss any limitations issue where weapons seized in February 2001, and indictment with forfeiture request not filed until December 2001); *United States v. Hayden*, No. 07-68, 2008 WL 2783269, at *1 (N.D. Ind. Jul. 16, 2008) (declining to mention any limitations issue where gun seized on March 9, 2007 and indictment with forfeiture allegation filed July 25, 2007); *United States v. Thomas*, No. 07-3034, 2008 WL 1774153, at *1 (N.D. Iowa Apr. 16, 2008) (failing to recognize any limitations issue where firearm seized in December 2006 and indictment with forfeiture allegation issued in August 2007); *United States v. Henderson*, No. 05-78, 2005 WL 3263912, at *1 (N.D. Iowa Nov. 30, 2005) (omitting any mention of a limitations issue where firearm seized in October 2004 and indictment with forfeiture provision filed in September 2005); *United States v. Mejia*, No. 05-32, 2005 WL 2476215, at *1 (E.D. Pa. Oct. 6, 2005) (failing to note any limitations problem where firearm seized in October 2004 and indictment with forfeiture allegation filed in January 2005).

However, assuming in an abundance of caution that § 924(d)(1)'s limitations provision in fact applies in criminal matters in which the notice of forfeiture is filed in an indictment, this Court concludes that the statute began to run from the date that the Federal Government itself "seized" the weapon. Such seizure did not occur until the Government asserted jurisdiction over

18

Defendant by charging him with a violation of § 922(g)(1).  The Government timely filed its notice of forfeiture on the same day as it filed the Indictment; indeed, the notice appears in the Indictment.  The mechanism authorized by 28 U.S.C. § 2461(c) for including a notice of forfeiture in an indictment suggests that the timely filing of such an indictment satisfies § 924(d)(1).  Furthermore, if convicted, Defendant will be barred from possessing a firearm pursuant to the very same statute under which he will have been convicted, 18 U.S.C. § 922(g)(1).  It defies reason and logic to suggest that the Government's forfeiture request could be untimely or inappropriate where the indictment seeks the forfeiture, upon conviction for felon-in-possession, of Defendant's illegally possessed firearm.   Accordingly, this Court concludes that even if the § 924(d)(1) limitations period applies to notices of forfeiture in criminal indictments, the limitations period did not begin to run until the Government asserted jurisdiction over Defendant by way of the Indictment itself.  This Court will deny Defendant's motion to dismiss the notice of forfeiture.


IV.     **Defendant's Request for *In Camera* Review of the Personnel Files of Officers Grainger and Washington**

At the suppression hearing, defense counsel requested that Government produce the personnel and internal affairs files of the testifying officers for an *in camera* review by this Court. Defense counsel asked that this Court order disclosure to the defense of any information the Court deemed relevant in these files, particularly information relevant to the witnesses' credibility or otherwise required to be disclosed pursuant to *Brady* or *Giglio*.  This Court ordered both sides to submit supplemental briefing on the issue.  Initially, Defendant sought disclosure of

19

the entire file directly to the defense, but Defendant's written submission on this issue makes clear that Defendant only seeks *in camera* review.  Furthermore, although three officers testified at the suppression hearing, Defendant only asks for *in camera* review of the files of Officers Grainger and Washington.

With regard to *in camera* review to aid the Court's assessment of the officers' "credibility, motivation and potential bias" (Def.'s Sept. 29. 2008 Letter at 1), Defendant has not identified any precedent requiring such review for this purpose.  This Court certainly does not need to review these extraneous materials to form its own conclusions regarding the witnesses' credibility, and the Court has indeed made its credibility findings after presiding over the suppression hearing and carefully reviewing the testimony of the witnesses.  Therefore, *in camera* review is not warranted simply to assist the Court in making credibility determinations.

To the extent Defendant makes this request to facilitate disclosure of relevant *Brady* or *Giglio* information to the defense, Defendant is not entitled to an *in camera* review, and the Government is not obligated to produce the files for such review.  Our Circuit has held that "[a] defendant seeking an *in camera* inspection to determine whether files contain *Brady* material must at least make a 'plausible showing' that the inspection will reveal material evidence."  *Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15 (1987)).  Defendant has offered no reason to suspect that the files contain any relevant information.  Our Circuit has held in this regard that "[m]ere speculation is not enough."  *Riley*, 277 F.3d at 301.  Here, it is not enough for the defense merely to question the officers' credibility and thereby suggest that the files could possibly contain information relevant to the assessment of credibility, let alone relevant for *Brady* or other purposes.  Absent some articulable reason

beyond mere speculation, courts have routinely denied defendants' requests for access to police personnel files in various contexts. *See, e.g.*, *United States v. Lafayette*, 983 F.2d 1102, 1106 (D.C. Cir. 1993) (denying disclosure of personnel files in motion for new trial because "nothing in appellants' brief informs us why they have any reason to believe that the personnel files would provide any useful evidence whatsoever"); *United States v. Andrus*, 775 F.2d 825, 843 (7th Cir. 1985) ("Mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial.") (quoting *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984)).

Prosecutorial review of potential *Brady* material ordinarily is sufficient absent some exceptional circumstances. *In camera* review arises only where a defendant reasonably suspects that the Government has withheld *Brady* or other discoverable evidence. *See United States v. Brooks*, 966 F.2d 1500, 1504-05 (D.C. Cir. 1992) (collecting cases); *see also United States v. Caro-Muniz*, 406 F.3d 22, 30 (1st Cir. 2005); *United States v. Walker*, No. 05-440-11, 2008 WL 5002937, at *3 (E.D. Pa. Nov. 24, 2008); *United States v. Rodriguez*, No. 07-709-01, 2008 WL 4925010, at *3 (E.D. Pa. Nov. 17, 2008).  In this Circuit, "although *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963), mandates that the prosecution disclose impeachment material that is exculpatory to the defendant, it does not require that the prosecution make the file available for the defendant's general perusal.  Instead, the government need only direct the custodian of the files to inspect them for exculpatory evidence and inform the prosecution of the results of that inspection, or, alternatively, submit the files to the trial court for *in camera* review."  *United States v. Dent*, 149 F.3d 180, 191 (3d Cir. 1998).   At oral argument, counsel for the Government stated that the Government has followed this procedure, by arranging for the custodian of the

files for the Newark police and to turn over any *Brady* or *Giglio* information to the Government if located.  (Tr. 79:19-80:4.)  This Court will hold the Government to its representation.  In any event, as this Court has discussed, "[t]o obtain an *in camera* inspection, the defendant must at least make a plausible showing that the inspection will reveal material evidence."  *Rodriguez*, 2008 WL 4925010, at *3 (internal quotations and citations omitted).  No such showing has been made here.

This Court is satisfied that the terms of the Standing Discovery Order in this matter, and the Government's representation that it will adhere to its disclosure obligations, obviates any need for *in camera* review at this time.  Because there is no indication of any failure to adhere to its *Brady* duties, "there is no need for the Court to undertake the requested *in camera* review and, for that reason, the Court declines to do so."  *United States v. Avellino*, 129 F. Supp. 2d 214, 220 (E.D.N.Y. 2001).  This Court expects the Government to continue to adhere to its *Brady*, *Giglio*, and other obligations and promptly disclose any exculpatory or other discoverable information to the defense if such information comes to the Government's attention.  Defendant's request that the Government produce the personnel and internal affairs files of Officers Grainger and Washington for *in camera* review will be denied.

## V.    Defendant's Pretrial Discovery and Hearing Requests

Defendant's remaining motions request certain discovery as well as a hearing regarding the admissibility of his prior convictions pursuant to Federal Rule of Evidence 609.  With regard to the latter request for a hearing, unanimity reigns.  The Government does not oppose this request, stating in its brief that it "believes the Court should hold a hearing before any evidence

sought to be admitted pursuant to Fed. R. Evid. 608 or 609 is admitted to cross-examine any of the witnesses in this case." (Gov't Br. at 4.)   At the propitious time, the Court will oblige the parties' request for a hearing on the admissibility of prior convictions of any witness, not just of Defendant.

With regard to Defendant's discovery motions, all are addressed in this Court's Standing Discovery Order ("SDO") dated October 25, 2007. (Doc. No. 11.)  Defendant moves to compel the Government to disclose pretrial any "other crimes" evidence to be admitted pursuant to Federal Rule of Evidence 404(b).  This request is addressed in SDO ¶ 3, and such evidence is to be turned over to Defendant within 10 days of trial.  The Government represents that it will comply with the SDO and both notify Defendant of any Rule 404(b) evidence within 10 days of trial and file a Rule 404(b) motion within the same time limit.  Accordingly, Defendant's request for Rule 404(b) disclosure is moot, and no disclosure earlier than that mandated by the SDO is warranted.  *See, e.g.*, *United States v. Evangelista*, 813 F. Supp. 294, 302 (D.N.J. 1993) (finding 10-day notice constitutes sufficient "reasonable notice" under Rule 404(b)).

Defendant's request for *Brady* evidence, i.e., evidence favorable to him, and unfavorable to the prosecution, is addressed in SDO ¶ 1(f) and (g).  Defendant states that no *Brady* material has yet been produced to the defense, but the Government responds that it has complied and will continue to comply with its obligations under *Brady* and the SDO by producing any such evidence "should any exculpatory material come into its possession." (Gov't Br. at 5.)  To the extent that Defendant seeks early disclosure of *Brady* or *Giglio* material, the Third Circuit has held that ordering disclosure on the day the witness is to testify satisfies the requirements of due process.  *See United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983).  Thus, Defendant's motion

23

for disclosure of *Brady* material will be denied as moot.

Defendant also seeks early disclosure of Jencks Act material.  SDO ¶ 4 addresses this issue, as it requires the Government to produce such material "sufficiently in advance of the witness's testimony to avoid delay in the trial."   The Government represents in its brief that it "will voluntarily produce *Jencks* material three days before the testimony of each witness." (Gov't Br. at 6.)  Notably, the express statutory language of the Jencks Act declares that the defendant is not entitled to such material until the Government's witness has testified.  Thus, Defendant's request for disclosure earlier than the Government's voluntary three-day advance disclosure will be denied.  *See United States v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978) ("[T]he Jencks Act flatly states that disclosure of prior statements by government witnesses may not be compelled 'until said witness has testified on direct examination in the trial of the case.'"); *see also United States v. Christie*,570 F. Supp. 2d 657, 676 (D.N.J. 2008) (Ackerman, J.).

Defendant also requests that this Court order the Government to "review the personnel files of law enforcement officers who participated in this case and who will testify at pretrial hearings or trial."  (Def.'s Br. at 12.)  This Court has already ruled that such files need not be produced for *in camera* review at this time.  As the Government further notes, this request is "substantially similar to the Defendant's request for *Brady* and Jencks material" (Gov't Br. at 5 n.2), and this Court expects that any information from these files that falls under *Brady, Giglio*, and the Jencks Act be disclosed pursuant to the terms of the SDO.  To the extent that Defendant also requests disclosure of any "rough notes" prepared by law enforcement, such notes also are discoverable only insofar as they come within the requirements of *Brady*, *Giglio*, and the Jencks Act.  *See United States v. Ramos*, 27 F.3d 65, 69-70 (3d Cir. 1994).  Thus, any request in this

24

regard is a "redundantly specific subset of [Defendant's] general motion, which is itself somewhat redundant inasmuch as those materials are already part of the Court's standing discovery Order." *Christie*, 570 F. Supp. 2d at 676 n.11.

Defendant also asks that the Government produce, prior to trial, a summary report of any expert opinion testimony the Government plans to introduce. SDO ¶ 1(e) adequately addresses this issue. The Government states that in three letters to the defense, it has represented that "if this case proceeds to trial and the defense refuses to stipulate, the Government intends to call an as yet unidentified expert to testify that the handgun recovered from the Defendant was a firearm as that term is defined under federal law, that the firearm was manufactured outside the state of New Jersey, and that it traveled in interstate commerce." (Gov't Br. at 8.) The Government also informed the defense in these letters that, absent stipulation regarding Defendant's previous convictions, the Government will call another as yet unidentified expert "to testify regarding the correlation between the fingerprint cards from the Defendant's prior arrest and the prints taken from the arrest underlying the current charge." (*Id.*) The Government thus contends that it has complied with all requirements under the SDO and the Federal Rules up to this point. Federal Rule of Criminal Procedure 16(a)(1)(G) requires the Government, at a defendant's request, to give the defense a written summary of any expert testimony, including "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." At this time, because no expert witnesses have been identified, Defendant's motion for a summary of expert testimony will be denied. Once the Government identifies any expert witnesses it intends to call at trial, it should honor Defendant's request for a summary, pursuant to the terms of Rule 16(a)(1)(G) and SDO ¶ 1(e).

Finally, Defendant asks that he be allowed to file any additional motions that may become necessary as further information becomes available.  The Government does not oppose this request, provided that the Government also have the opportunity to file such additional motions and that such additional motions comply with the SDO.  Again, unanimity reigns, and Defendant's request shall be granted.


**VI.    Government's Request for Reciprocal Discovery**

The Government cross-moves for reciprocal discovery from Defendant with regard to any Jencks Act material and other evidence pursuant to Federal Rules of Criminal Procedure 16(b)(1)(A), (B), and (C).  Rule 16(b)(1)(A) provides that where the Government complies with a defendant's request for disclosure under Rule 16(a)(1)(E), defendant must then similarly allow the Government, on request, to inspect documents and objects in defendant's possession which defendant intends to use in its case-in-chief at trial.  Fed. R. Crim. P. 16(b)(1)(A).  Rules 16(b)(1)(B) and (C) impose similar conditions and requirements regarding reciprocal discovery of scientific tests and expert testimony, respectively.  The Government states that it has complied with its discovery obligations by producing discovery to the defense on three occasions, and that it has not received any reciprocal discovery from Defendant.  This Court orders Defendant to provide reciprocal discovery as required by the Federal Rules.  This Court will grant the Government's motion in this regard.

### *Conclusion and Order*

For the foregoing reasons, Defendant's pretrial motions (Doc. No. 27) are hereby

DENIED.  The Government's cross-motion (Doc. No. 29) for reciprocal discovery is

GRANTED.


Dated:  December 4, 2008
Newark, New Jersey


<u>/s/ Harold A. Ackerman</u>
U.S.D.J.

27